The BABCOCK & WILCOX COMPA-
NY and B & W Nuclear Environ-
mental Services, Inc., Appellees

v.

AMERICAN NUCLEAR INSURERS
and Mutual Atomic Energy Liability
Underwriters and other Interested
Party: Atlantic Richfield Company.

Appeal of American Nuclear Insurers
and Atomic Energy Liability
Underwriters.

American Nuclear Insurers and Mutual
Atomic Energy Liability Underwriters,
Appellant

v.

The Babcock & Wilcox Company and B
& W Nuclear Environmental Services,
Inc., and Atlantic Richfield Company.

Superior Court of Pennsylvania.

Argued Oct. 31, 2012.

Filed July 10, 2013.

Andrew Amer, New York, New York, for American Nuclear and Mutual Atomic Energy, appellants.

James A. Datillo, Pittsburgh, for Atlantic Richfield, appellee.

Thomas M. Reiter, Pittsburgh, for B & W Nuclear, appellee.

BEFORE: MUSMANNO, J., OLSON, J., and WECHT, J.

OPINION BY WECHT, J.:

In this insurance coverage dispute, Appellants American Nuclear Insurers and Mutual Atomic Energy Liability Underwriters (collectively, "ANI") challenge the trial court's February 17, 2012 Amended Final Order and Judgment. In that order, the trial court ruled, *inter alia*, that ANI was obligated to provide insurance coverage to Appellees The Babcock & Wilcox Company and B & W Nuclear Environmental Services (collectively, "B & W") in the amount of $80 million plus pre-judgment interest. This constituted the aggregate amount that B & W, acting independently and over ANI's objections, paid hundreds of plaintiffs to settle federal damage claims arising from plaintiffs' exposure to radiation. We vacate the trial court's judgment and remand for further proceedings.

This is not the first time that this case has come before us. In 2002, we set forth the underlying facts and allegations as follows:

This case involves insurance coverage disputes for two nuclear fuel processing facilities: the "Apollo Facility" and the "Parks Facility." In 1957, the Atomic Energy Commission ... licensed these facilities to possess nuclear material....

Since March 1958, ANI (or its predecessor) provided insurance coverage for nuclear hazards at the Apollo and Parks [F]acilities[, presently owned and operated by B & W and previously owned and operated by Atlantic Richfield Company ("ARCO")]. Over the years, the limits on the coverage increased from $3 million to $160 million [per facility] as of February 1979.

In June 1994, five individuals and three purported class representatives filed an action against B & W and

ARCO in federal district court ("the *Hall* case"). These plaintiffs alleged that they sustained bodily injury and property damage caused by radioactive emissions from the Apollo Facility and the Parks Facility. Subsequently, amended complaints were filed adding approximately 300 named plaintiffs to the *Hall* case, but not substantially changing the causes of action. B & W and ARCO denied that the facilities released radioactive or toxic materials into the environment that exceeded the levels permitted by federal regulation. They further denied that any of the plaintiffs' [damages were] attributable to releases from the facilities.

In 1998, the federal district court tried eight "test cases" from the *Hall* case in a single jury trial. The jury returned verdicts in favor of the eight plaintiffs totaling $33.7 million against B & W and ARCO, and an additional $2.8 million against only B & W. However, the federal trial court subsequently granted a new trial based upon evidentiary errors. After the grant of a new trial, a coverage dispute arose regarding the limits of coverage available to indemnify B & W and ARCO against claims made in the *Hall* action. Additionally, a dispute arose as to whether B & W and ARCO are each entitled to counsel in the new trial. . . .

While the new trial in the federal case was pending, ANI filed a declaratory judgment action in the Court of Common Pleas of Allegheny County against B & W and ARCO. ANI's Complaint sought declarations regarding[, *inter alia*,] whether it had a duty to provide separate counsel to ARCO in the *Hall* case. In addition, ANI also alleged bad faith and breach of contract by B & W. B & W filed its own action . . . seeking declarations regarding the coverage is-

sues, and alleging bad faith against ANI. These actions were consolidated. . . .

On August 10, 2000, the trial court entered an Order, which had been agreed to by the parties, setting forth the issues for preliminary determination. This Order provided, in relevant part, as follows:

> Until further Order of Court, the Actions shall proceed for the limited purpose of resolving the following legal issues (the "Issues for Resolution"):
>
> a. Whether ANI, having acknowledged a duty to defend ARCO in the *Hall* Action, is obligated to pay for supplemental and/or independent defense counsel to represent and defend ARCO's separate interests in the *Hall* Action[?]
>
> b. Whether ANI, having acknowledged a duty to defend B & W in the *Hall* Action, is obligated to pay for supplemental and/or independent defense counsel to represent and defend B & W's separate interests in the *Hall* Action[?]

Trial Court Order, 8/10/00. The trial court stayed all further action on the bad faith claims until the resolution of these issues.

Subsequently, ANI, B & W and ARCO each filed motions for partial summary judgment with respect to the Issues for Resolution, seeking declarations regarding the available policy limits and the duty to provide separate counsel. On April 5, 2001, the trial court entered an Order, which provided, in relevant part, as follows:

> \*     \*     \*
>
> (2) ANI has a duty to pay for independent defense counsel to represent and defend the separate interests of B & W and ARCO in the *Hall* [A]ction. . . .

Order, 4/25/01, at 2. ANI filed a Motion for reconsideration of the trial court's Order, which the trial court granted. On October 1, 2001, the trial court entered an Order again holding … that ANI has a duty to provide separate counsel for ARCO in the *Hall* [A]ction. Order, 10/1/01. The trial court's Order also certified these issues for immediate appeal.

*Babcock & Wilcox Co. v. Amer. Nuclear Ins.*, 1916 WDA 2001, Slip. Op. at 2–5, 2002 WL 31749119 (Pa.Super. Nov. 25, 2002) (unpublished). Following review, this Court affirmed the trial court's order.

The trial court, per the Honorable R. Stanton Wettick,[1] provides the following account of the events that followed our affirmance of the trial court's order:

[T]hrough negotiations with counsel retained by [B & W], the *Hall* plaintiffs settled their claims with [B & W] for less than the policy limits. The settlement funds were provided by [B & W]. ANI disagreed with the decision to settle.

At the request of the parties, I held a status conference following the settlement of the *Hall* [Action]. At the conference, there were no surprises. [B & W] is seeking reimbursement for the full amount paid to settle the *Hall* [Action], together with counsel fees. ANI is defending on the ground that it has no obligation to make any payment because [B & W violated] the consent to settlement clauses in the … policies issued to [B & W].[2]

At the status conference, the parties requested that I address their disagreement over the legal standard to be applied in determining ANI's insurance coverage obligations.

The standard proposed by [B & W] is as follows:

If an insurer breaches its duty to consent to a reasonable settlement within insurance limits, the insured may settle without the insurer's consent, without forfeiting its insurance coverage, provided the settlement is reasonable and entered into in good faith. [B & W's] Motion for Ruling on the Legal Standard, Proposed Court Order.

The standard proposed by ANI is as follows:

This articulation of the bad faith standard which follows from *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (Pa.1957), and its progeny should apply here. Accordingly, the Court should enforce ANI's Consent–to–Settlement Clauses and bar coverage for [B & W's] settlement[ ] unless [B & W] can show by clear and convincing evidence that: (a) there was no real chance of a defense verdict in the *Hall* Action; (b) there was little possibility of a verdict or settlement within policy limits; (c) ANI's decision to proceed to trial rather than settle was not based on their bona fide belief, predicated upon all of the circumstances of the case, that there was a good possibility of winning; and (d) ANI's decision to litigate rather than settle was made

---

1. Judge Wettick presided over all proceedings discussed herein except for the trial itself, which proceeded before the Honorable Robert J. Colville.

2. The relevant language of the consent to settlement clauses in the policies at issue, which, in standard language, preclude the insured

from settling claims, acceding to any judgment, or otherwise interfering with ANI's prerogatives in conducting the defense and determining whether to accept a given settlement offer, is set forth in the trial court's order of 2/17/2012, at 1–2 ¶ 2.

dishonestly. ANI's Memorandum of Law Regarding the Legal Standard at 15–16.

Trial Court Opinion ("T.C.O."), 12/3/2009, at 1–3 (citations modified).

After reviewing the policies, the trial court agreed with ANI that, under the unambiguous language of the policies, ANI had "no obligation to reimburse [B & W] for any funds that [B & W] paid to settle the case.... [However,] B & W contends that the courts will not enforce standard consent to settlement clauses where the insured, acting in good faith, enters into a reasonable settlement at or below the policy limits." *Id.* at 4. The learned trial court concluded that the *Cowden* standard provided the appropriate measure of ANI's obligation to fund B & W's negotiated settlement with the plaintiffs in the *Hall* litigation. Thus, only if B & W could plead and prove satisfaction of the four-part *Cowden* test would B & W be entitled to reimbursement for the $80 million it paid to settle the outstanding claims over ANI's objection.

*Cowden* is the seminal Pennsylvania precedent establishing an insurer's obligation to accept a settlement within the limits of the policy issued to the defendant "when there is little possibility of a verdict or settlement within the limits of the policy." 134 A.2d at 226. However, the duty to settle under those circumstances is not absolute; even when an excess award is imminent if the fact-finder returns a verdict for the plaintiff, the insurer may decline to settle within policy limits and proceed to trial when it has a "bona fide belief ..., predicated upon all of the circumstances of the case, that it has a good possibility of winning the suit," *i.e.*, obtaining an unqualified defense verdict. *Id.* "[I]t is not a right of the insurer to hazard

the insured's financial well-being. Good faith requires that the chance of a finding of non[-]liability be real and substantial and that the decision to litigate be made honestly." *Id.*

The principle driving this ruling was our Supreme Court's recognition that, in such situations, the interests of the insurer and the insured may be antagonistic: If an insurer is exposed only to liability up to the limit of its policy, and any settlement would be at or near that level, then even a modest chance of obtaining a defense verdict might be sufficient in a self-interested cost-benefit analysis to convince an insurer to litigate despite the prospect of a verdict in excess of the policy limits. Thus, "[w]hile it is the insurer's right under the policy to make the decision as to whether a claim against the insured should be litigated or settled, it is not a right of the insurer to hazard the insured's financial well-being." *Id.*

Returning to the instant matter, following further proceedings that need not be detailed herein, on July 5, 2011, the trial court issued a memorandum and order that added the following observations to the above-excerpted factual background:

This is not a case in which a verdict was likely to exceed the policy limits. In the *Hall* [Action], it is very questionable whether the plaintiffs, represented by competent counsel, would have settled the case for $80 million if there was a realistic possibility that the verdict would exceed $320 million if the case proceeded to trial.

This is not a case in which the terms of the settlement included a promise of the plaintiffs in the underlying litigation that they will look only to [B & W's] insurance company for payment of the settlement amount. [3] To the contrary, this

---

**3.** This refers to a common practice utilized

when the insured is judgment-proof. The in-

case involves an insured who paid the amount of the settlement. Thus, in negotiating with the *Hall* plaintiffs, [B & W] had a strong interest to hold out for the best possible deal because of the likelihood that the [ANI Policies] will not cover the *Hall* [Action].

T.C.O., 7/6/2011, at 2 (typography modified for clarity).

The trial court then revisited what legal standard a jury should apply in the trial to follow, arriving at a significantly different answer than it had in its 2009 ruling. Indeed, instead of finding that ANI would be obliged to indemnify B & W for its settlement funds only if it declined to settle the case in bad faith under *Cowden*, the trial court ruled that there was no principled distinction between a case in which an insurer provides a defense subject to a reservation of rights, the circumstances before the trial court, and a case where the insurer denies both defense and coverage. *Id.* at 4. Thus, rejecting its 2009 indication that the *Cowden* standard would govern the question whether ANI would be bound to indemnify B & W for the settlement, the Court instead analogized the instant case to *Alfiero v. Berks Mutual Leasing Co.*, 347 Pa.Super. 86, 500 A.2d 169 (1985), under which B & W would be entitled to reimbursement if the settlement was fair, reasonable, and non-collusive.

In *Alfiero,* following a severe injury to the plaintiff in a motor vehicle accident, the plaintiff filed suit against the owner and the manufacturer of the vehicle that had struck the plaintiff's vehicle. 500 A.2d at 170. An amicable settlement was reached that resulted in a judgment in

favor of the plaintiff and against the owner for $950,000. The owner's primary insurance carrier furnished its $100,000 policy limit to the plaintiff. *Id.* In a separate declaratory judgment action, the trial court rejected the owner's excess insurer's contention that it was not obligated to indemnify the owner. *Id.* at 171. Instead, the trial court found that the excess insurer was obligated to provide umbrella or excess coverage in an amount not to exceed $1 million. Underpinning the trial court's determination was its finding that the excess insurer's denial of coverage had constituted a repudiation of its insurance contract with the owner. *Id.* Consequently, the insured was free to "negotiate a settlement in an amount that was fair and reasonable." *Id.* at 171–72.

This Court agreed. Noting the insurer's obligation of good faith to its insured, we found that the excess insurer's "repeated[ ] den[ial of] any obligation to defend or to indemnify" the insured constituted a "breach of [the insurer's] duty to act in good faith" and a "repudiation" of the insurance contract. *Id.* at 172 (citing, *inter alia,* Restatement (Second) of Contracts § 250 (1979)). As a consequence of that breach, the insured was entitled to negotiate a settlement directly with the plaintiff "so long as it was done in good faith and the settlement was fair and reasonable." *Id.*

In this case, the trial court explained its determination that *Alfiero* furnished the appropriate standard as follows:

[W]hen the insurance company has denied coverage and a defense, case law

---

sured and the plaintiff reach a settlement for a given amount that releases the insured from any personal exposure for that amount. In consideration, the insured assigns to the plaintiff the insured's right to seek indemnification for the settlement from the insurer. *See, e.g., Un. Nat'l Ins. Co. v. Jacobs,* 754

F.Supp. 865 (M.D.Fla.1990); *Taylor v. Safeco Ins. Co.,* 361 So.2d 743 (Fla.Ct.App.1978); *Kelly v. Iowa Mut. Ins. Co.,* 620 N.W.2d 637, 641 (Iowa 2000) ("[T]he estate, as [the insured's] assignee, stands in the shoes of [the insured]....").

(using principles of waiver, estoppel, and implied obligations of good faith and fair dealing) allows the insured who has entered into a fair and reasonable settlement over the opposition of the insurance company to obtain reimbursement from the insurance company (assuming there is coverage). The reason for this outcome is that the insurance company should not be making settlement decisions on behalf of the insured [while repudiating its obligations to defend and indemnify] where the insured may be liable for the verdict entered in the underlying case.

This is equally true where the insurance company is providing a defense under a reservation of rights. The insurance company should not be the sole decision maker where there is a possibility that only the insured's interests will be affected by the outcome of the underlying litigation.

When a defense is being provided under a reservation of rights, the interests of the insurance company, with respect to settlement of the underlying litigation, conflict with the interests of the insured. Because the insured may be responsible for paying any verdict, in most instances it desires to cap potential liability through a settlement at the lowest amount it can achieve. However, the insurance company is likely to reject a settlement offer that is fair and reasonable because by accepting the offer, it would be giving up its claim that there is no coverage.

The more that the insurance company believes that it can establish that there is no coverage, the more likely the insurance company will deny the insured's request to agree to what appears to be a very reasonable settlement offer because (unless the parties otherwise agree) the only way for the insurance company to challenge coverage is by having the underlying case proceed to trial.[4] Also, where a verdict in the underlying case is very unfavorable to the insured, the likelihood increases that the insurance company will vigorously litigate coverage issues. Thus, there is not much difference between the interests of the insured where coverage has been denied and the interests of the insured where the insurance company is providing a defense under a reservation of rights. . . .

A ruling that an insured may enter into a reasonable settlement offer made in good faith and without collusion recognizes both the interests of the insurance company and the insured. It allows the insurance company to continue to make decisions as to settlement (including the right to reject reasonable settlement offers) by withdrawing the right to challenge coverage. However, if the insurance company wants to preserve the option of questioning coverage, it cannot prevent the insured from protecting its interests in capping liability through a settlement that is fair and reasonable.

T.C.O., 7/6/2011, at 4–6 (footnote omitted). Thus, in effect, the trial court ruled that ANI would be obligated to reimburse B & W for the costs of settlement to the extent that the settlement value negotiated between B & W and the *Hall* action plaintiffs was "fair and reasonable." *Id.* at 3–6.

In addition to citing *Alfiero*, the trial court also reached outside Pennsylvania, where it found several cases in which courts perceived a distinction without a difference between an insured's settlement

---

4. This is an oversimplification, to say the least. Consistently with a number of the cases cited below, insurers may, and often do, seek declaratory judgments regarding coverage during the pendency of the underlying litigation.

authority when an insurer openly repudiates coverage and its obligation to defend versus when an insurer provides a defense subject to a reservation of rights. *Id.* at 6–9 (discussing *United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987); *Kelly v. Iowa Mut. Ins. Co.,* 620 N.W.2d 637 (Iowa 2000); *Patrons Oxford Ins. Co. v. Harris,* 905 A.2d 819 (Me.2006); *Martin v. Johnson,* 141 Wash.App. 611, 170 P.3d 1198 (2007)). In each of these cases, the court held that, when an insurer defends subject to a reservation of rights, the insured is free to enter into a settlement without the insurer's approval, and, should coverage be found, collect from the insurer that portion of the settlement amount demonstrated to be fair and reasonable. Adopting this approach and legal standard, the trial court here directed that the parties proceed to a trial at which the jury would be called upon to determine whether the $80 million settlement reached by B & W in this case was "fair and reasonable." *Id.* at 11.

Thereafter, the parties proceeded to trial before the Honorable Robert J. Colville. The jury determined that the *Hall* settlement was fair, reasonable, and non-collusive. Consequently, on February 17, 2012, Judge Wettick entered the order from which the instant appeal arises. That order provided, in relevant part, as follows:

1. By voluntary agreement of [ANI and B & W] . . . all claims asserted by any Party pending in this action are severed and dismissed with prejudice except [B & W's] claims seeking reimbursement under [the Policy] for the amounts that [B & W] paid to settle the underlying Hall action (plus pre-judgment and post-judgment interest) . . .;

2. With respect to the Settlement Claims, ANI has waived, and therefore [is] adjudged to have waived, any and all rights to appeal based on: . . . any defenses and arguments of any kind except ANI's position that ANI was not required to reimburse [B & W's] settlements under any of the following Policy provisions: (i) "[T]he companies may make such investigation, negotiation and settlement of any claim or suit as they deem expedient"; (ii) "The insured shall not, except at its own cost, make any payment, assume any obligation or incur any expense"; (iii) "This policy does not apply . . . to liability assumed by the insured under contract, other than an assumption in a contract with another of the liability of any person or organization which would be imposed by law on such persons or organization in the absence of an express assumption of liability"; and/or (iv) "No action shall lie against the companies or any of them, unless, as a condition precedent thereto . . . the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the companies" . . . .

T.C.O., 2/17/2012, at 1–2. In the same order, the trial court entered judgment against ANI and in favor of B & W in the aggregate amount of $80 million plus pre-judgment interest of over $15 million. This appeal followed.

ANI raises a single issue before this Court:

Whether ANI had the right to deny coverage for [B & W's] unauthorized $80 million payments to settle the *Hall* Action where: (1) the ANI Polic[y], which had combined limits of $320 million, unambiguously afford[ed] ANI the right to control settlement and exclude coverage

for unauthorized payments; (2) ANI was fully performing its policy obligations by funding [B & W's] $40 million-plus defense in the *Hall* Action; and (3) ANI's decision to continue defending the *Hall* Action comported with the Pennsylvania Supreme Court's decision in [*Cowden*]. Brief for Appellants at 4–5 (typography modified for consistency).[5]

▇▇▇ ANI presents a question of insurance contract interpretation, as to which our review is governed by the following principles:

The interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court. The interpretation

of an insurance contract is a question of law, and our standard of review is de novo, thus, we need not defer to the findings of the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language of the policy is clear and unambiguous, we must give effect to that language.

*Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 938 A.2d 286, 290 (2007) (internal quotation marks, citations, and modifications omitted).

**5.** B & W argues at length that ANI has waived its right to challenge the trial court's July 11, 2011 ruling that confined the ensuing trial to the question of whether the settlement entered into by B & W and the *Hall* plaintiffs was "fair and reasonable." In essence, B & W contends that ANI's challenge was to matters encompassed within the jury instructions issued at trial. B & W asserts that ANI failed to challenge the legal standard imposed by the July 11, 2011 order, failed to state any exception to the relevant portions of the jury instruction, and failed to challenge the instruction in ANI's post-trial motions.

ANI disagrees. It argues that it repeatedly challenged the July 11, 2011 order, and that that order was a non-final order that "produced" the judgment. It further notes that, because the judge presiding over the trial (Judge Colville) was different than the judge who established the legal standard against which the case would be measured at trial (Judge Wettick), any such challenge necessarily would have been futile under the collateral order doctrine. *See, e.g., Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995) ("[J]udges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions.").

At trial, ANI noted its continuing disagreement with the July 11, 2001 order, and challenged the substance of that same order in its post-trial motion. *See, e.g.,* Letter to Hon. R. Stanton Wettick, 7/14/2011, at 1 (seeking certification for immediate appeal of order pre-

scribing *Alfiero* standard); Overview of ANI's *In Limine* Motions to Exclude Inadmissible Evidence, 8/09/2011, at 10; ANI's Post–Trial Motion and Motion for Reconsideration, 9/29/2011, at 1–7. While it might have been more prudent for ANI to have objected to the jury charge at trial, ANI has not waived its right to challenge the complained-of order. *See Betz v. Pneumo Abex LLC*, 44 A.3d 27, 54 (Pa.2012) ("[A]n appeal of a final order subsumes challenges to previous interlocutory decisions....").

At oral argument, B & W renewed its related Motion to Strike or Suppress Portions of [ANI's] Reply Brief Addressing the Waiver and Appealability Issue, which this Court denied without prejudice to reassert the issue at argument by order filed February 26, 2013. Therein, B & W argues that ANI improperly addressed the question of waiver in its reply brief, having failed to address the issue in its primary brief. Rule 2113(a) provides that "the appellant may file a brief in reply to matters raised by appellee's brief ... and not previously addressed in appellant's brief." ANI did not face an issue of waiver in this Court until Appellee raised it in its responsive brief. No authority cited by B & W suggests that an appellant must anticipate an appellee's argument that the appellant's claims are waived, or that it is an inappropriate topic to address in a reply brief, when it constitutes an issue raised in the appellee's brief. Accordingly, B & W's motion to strike or suppress ANI's reply brief is denied.

■ The question presented in this case is one of first impression.[6] However, the question of an insured's obligation to honor a consent to settlement clause in an insurance contract when an insurer tenders a defense subject to a reservation of rights has been addressed by numerous other state and federal courts.

■ Our determination of the best approach to the question presented must be measured by its conformity with bedrock principles of Pennsylvania insurance law, as follow:

> Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract governs its interpretation.

> Such intent is to be inferred from the written provisions of the contract. If doubt or ambiguity exists it should be resolved in the insured's favor.[7]

\* \* \*

> The duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage.... [T]he obligation to defend arises whenever the complaint filed by the injured party may potentially come within the coverage of the policy.

\* \* \*

6. Notwithstanding our clear averment of novelty, which is confirmed by our painstaking research, the dissent reads this opinion as "acknowledg[ing] that our Supreme Court's decision in *Cowden* supplies the applicable rule of decision when a court is asked to enforce a consent-to-settlement clause where an insurer provides a defense and advises its insured that it intends to contest indemnity," Diss. Op. at 23, but does not point us to where we may have done so, explicitly or implicitly. As set forth, *infra*, we do acknowledge that, to the extent that bad-faith analysis applies in this context (a topic taken up below), *Cowden* furnishes the governing standard. However, we do not "acknowledge" that *Cowden* (or *Birth Center v. St. Paul Cos., Inc.*, 567 Pa. 386, 787 A.2d 376 (2001), which the dissent cites to similar purpose), controls the question presented, which concerns the enforceability of a consent to settlement clause under the particular circumstances of this case.

Similarly, we disagree with the dissent's suggestion that our analysis in this case is at odds with our obligation, as an intermediate appellate court, "to follow the precedent set down by our Supreme Court." Diss. Op. at 24 (quoting *Sackett v. N'wide Mut. Ins. Co.*, 4 A.3d 637, 641 (Pa.Super.2010)). We certainly are obligated to follow controlling precedents "[w]here the Supreme Court has spoken on [the particular subject] before us," *Malinder v. Jenkins Elevator & Mach. Co.*, 371 Pa.Super. 414, 538 A.2d 509, 513 (1988) (emphasis added), but that obligation does not entail shoehorning novel cases into any ill-fitting slipper we find. Presented with a controversy that hinges upon a novel question of state law, we must resolve it in harmony with on-point Pennsylvania case law that informs any applicable aspect of our analysis. We have sought to do so in the lengthy discussion to follow, and glean no clear evidence from the dissenting opinion that we have failed in our endeavor.

The simple fact is that neither *Cowden* nor *Birth Center* nor any other case identified by the trial court, the parties, the dissent, or the members of this majority has spoken squarely to the question presented. Under these circumstances, we believe we have acted prudently in carefully reviewing such wisdom as can be found in other states' on-point precedent (which we have treated as nothing more than persuasive authority); measuring other states' decisional law for its soundness and its conformity with Pennsylvania's governing principles of insurance contract interpretation and the sound policy inclinations to be gleaned therefrom; and in adopting what we believe to be the most efficacious approach available.

7. *Cf. Stern Enterp., Inc., v. Penn State Mut. Ins. Co.*, 223 Pa.Super. 410, 302 A.2d 511 (1973) (holding that an insurance contract was not one of adhesion because there was no "great disparity of bargaining power" between the parties thereto).

■ [E]ven if there are multiple causes of action and one would potentially constitute a claim within the scope of the policy's coverage, the insurer would have a duty to defend until it could confine the claim to a recovery excluded from the policy.

*Penn–America Ins. Co. v. Peccadillos, Inc.,* 27 A.3d 259, 264–65 (Pa.Super.2011) (internal quotation marks and citations omitted). Thus, "[a]n insurer's duty to defend is broader than its duty to indemnify." *Amer. & Foreign Ins. Co. v. Jerry's Sport Center, Inc.,* 606 Pa. 584, 2 A.3d 526, 540 (2010); *see id.* at 541 ("As long as the complaint might or might not' fall within the policy's coverage, the insurance company is obliged to defend.").

■ Pennsylvania counterbalances the insurer's broad obligation to defend even claims as to which coverage may not apply by providing the insurer the option of defending subject to a reservation of its right later or simultaneously to contest coverage:

Where the insurer assumes the duty to defend, the insurer can simultaneously challenge whether the claim is covered under the insurance policy, even if the underlying case settles. An insurer's defense of the insured, therefore, does not waive the insurer's claims that a policy exclusion applies. It is common practice for insureds and insurance companies to file declaratory judgment actions when there is a dispute regarding whether the insurer has a duty to defend and/or indemnify....

*Step Plan Servs., Inc., v. Koresko,* 12 A.3d 401, 419 (Pa.Super.2010) (internal quota-

tion marks and citations omitted). Thus, in *Brugnoli v. United National Insurance Co.,* we held:

[A] liability insurer will not be estopped to set up the defense that the insured's loss was not covered by the insurance policy, notwithstanding the insurer's participation in the defense of an action against the insured, if the insurer gives timely notice to the insured that it has not waived the benefit of its defense under the policy.

284 Pa.Super. 511, 426 A.2d 164, 167 (1981) (quoting 14 G. Couch, Cyclopedia of Insurance Law § 51:83 (2d ed. 1965)); *accord Nichols v. Amer. Cas. Co. of Reading, Penna.,* 423 Pa. 480, 225 A.2d 80, 81–82 (1966); *Step Plan,* 12 A.3d at 419.

■ One important corollary of this paradigm is that to defend subject to a reservation does not, without more, constitute a breach or repudiation of the contract of insurance. Although we have found no Pennsylvania appellate case that states this proposition quite so clearly, it is widely recognized in numerous jurisdictions,[8] and is implicit within our own precedent. *See, e.g., Jerry's Sport Center,* 606 Pa. 584, 2 A.3d at 543–46 (2010) (detailing the soundness of permitting an insurer to defend subject to clear reservations of challenges to coverage). It also is reflected in the decision of at least one court of common pleas. *See Bedwell Co. v. D. Allen Bros., Inc.,* Nov. Term 2004 No. 1328, 2006 WL 3692592, at *2 (Phila.Cty. Dec. 6, 2006). Our many holdings recognizing an insurer's right to provide a de-

---

**8.** *See, e.g., Travelers Indem. Co. of Ill. v. Royal Oak Enterps., Inc.,* 344 F.Supp.2d 1358, 1370 (M.D.Fla.2004) ("[An] insurer does not breach its duty to defend by offering to defend only under a reservation of rights."); *Int'l Env'l Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh,* PA., 843 F.Supp. 1218, 1225 (N.D.Ill.1993); *Waste Mgmt., Inc., v. Int'l Surplus Lines Ins. Co.,* 144 Ill.2d 178, 206, 161 Ill.Dec. 774, 579 N.E.2d 322 (Ill.1991); *Kelly,* 620 N.W.2d at 642.

fense subject to a reservation of rights relies upon the validity of that proposition.[9]

■ Moreover, Pennsylvania cases have protected an insurer's right to control the defense, even when tendered subject to a reservation of rights. For example in *Jerry's Sport Center*, our Supreme Court noted that "an insurer faced with uncertainty about its duty to indemnify offers a defense under a reservation of rights 'to avoid the risks that an inept or lackadaisical defense of the underlying action' [by the insured] may expose [the insurer] to liability if it ultimately turns out there was a duty to indemnify." 2 A.3d at 545 (quoting *Terra Nova Ins. Co. Ltd. v. 900 Bar, Inc.*, 887 F.2d 1213, 1219 (3d Cir.1989)). Thus, an insurer defending subject to a reservation retains the ability to choose its own counsel, as a means of "protecting itself from the potential of a bad faith claim" for failure to defend. *Id.; see Fed. Ins. Co. v. X–Rite, Inc.*, 748 F.Supp. 1223, 1226 (D.Mich.1990) (holding under Michigan law that insurer retains right to select independent counsel for insured even when defending subject to a reservation, notwithstanding potential conflict of interest). By providing a defense to the insured, the insurer "acted as much in its own interest as it did in the [i]nsured's." *Jerry's Sport Center*, 2 A.3d at 545.[10]

Other jurisdictions, however, have recognized the potential for a conflict of interest between insurer and insured when the insurer defends subject to a reservation of rights. In *Bridge v. Air Quality Technical Services, Inc.*, for example, the United States District Court for the District of Maine observed that an insurer defending the claims as to which coverage was disputed would have an incentive to skew the trial evidence away from the conditions under which it would be obligated to provide coverage. 194 F.R.D. 3 (D.Me.1999). In this vein, the Missouri Court of Appeals has observed:

> The insurance company, if it were reserving a right to deny coverage under its policy, would be more or less zealous in its defense of the claim depending upon its evaluation of its exposure under its policy. Nothing chills one's zeal for a defense so much as the belief that, even if he loses, it will cost him nothing.... There would in many instances be a conflict of interest on the insurance company's part ... with the insurance company being as much interested in establishing facts which would result in non-coverage as in establishing facts showing the insured's non-liability.

*Mid–Century Ins. Co. v. McKelvey*, 666 S.W.2d 457, 459 (Mo.Ct.App.1984); *see Bridge*, 194 F.R.D. at 6. As noted, *supra*, the trial court relied heavily upon this proposition in support of its ruling. *See* T.C.O., 7/6/2011, at 4–6.

Some courts have suggested that the risk of such a conflict is ameliorated by the prospect of a post-verdict claim for insurer's bad faith:

> [W]e do not mean to intimate that [the insured] is ... free to select his own counsel and charge the expense thereof to [the insurer]. [The insurer] is still

---

9. B & W concedes this point. Brief for B & W at 58 ("[T]his appeal does not address whether an insurer 'breaches' or 'repudiates' its contractual obligations simply by filing a declaratory judgment action.").

10. ANI contends that defending pursuant to a reservation of rights is especially critical to insurers "in large commercial liability cases,

where (as here) complex fact patterns and protracted litigation make it impossible for claims professionals to divine from the outset whether some or all aspects of the insured's exposure to the claimants will fall outside the scope of the risk the insurer underwrote." Brief for ANI at 31.

entitled to control the defense of the action, including the selection of counsel[,] provided that the defense is pursued in good faith and without any endeavor to demonstrate that the policy issued by [the insurer] does not afford coverage to the claim. . . .

*Amer. Home Assur. Co. v. Weissman,* 79 A.D.2d 923, 434 N.Y.S.2d 410, 412 (1981); *see Vincent Soybean & Grain Co., Inc., v. Lloyd's Underwriters of London,* 246 F.3d 1129 (8th Cir.2001) (rejecting claim of bad faith in "arbitrary" refusal of insurer to settle claim under Arkansas law, and enforcing insured's breach of consent to settlement provision to preclude indemnity); *cf. L & S Roofing Supply Co., Inc., v. St. Paul Fire & Marine Ins. Co.,* 521 So.2d 1298 (Ala.1987) (adopting the reasoning of the Washington Supreme Court in *Tank v. State Farm Fire & Cas. Co.,* 105 Wash.2d 381, 715 P.2d 1133 (1986), which set forth procedures for an insurer to protect against the conflict of interest in defending subject to a reservation, including investigating the claims; retaining independent counsel for the insured; and informing the insured of all coverage-related developments). Pennsylvania law also has furnished some support for this approach. *See Birth Ctr. v. St. Paul Companies, Inc.,* 567 Pa. 386, 787 A.2d 376, 378 (2001) (upholding a bad-faith judgment against an insurer that refused to settle within policy limits, despite knowledge of the likelihood of an excess verdict). This is the position taken by ANI in its endeavor to have us enforce the consent to settlement clause absent a showing of bad faith on its part in declining to settle.

These observations lead us to review two competing lines of cases, upon which the parties rely to carry their respective arguments. ANI contends that the trial court erred when, in finding that *Alfiero* controlled, it effectively adopted the standard articulated in *Morris* and its progeny.

In *Morris,* faced with the question whether an insurer forfeits its right to control the defense and settlement by defending subject to a reservation, the Arizona Supreme Court held that an insured may settle over an insurer's objection:

When an insurer performs its contractual obligation to defend, the policy requires the insured to cooperate with the insurer. The insured must aid the insurer in the defense. He may not settle with the claimant without breaching the cooperation clause unless the insurer first breaches one of its contractual duties. If the insurer performs its obligations, the cooperation clause applies with full force, and settlement by the insured constitutes a breach of the policy.

\* \* \*

Faced with a potential coverage defense, [the insurer] properly reserved its rights to later assert the policy's intentional act exclusion. In so doing, [the insurer] did not breach any of its policy obligations. On the other hand, while [the insurer] did not abandon its insureds by breaching any policy obligation, neither did it accept full responsibility for [the insured's] liability exposure.

As a consequence of [the insurer's] reservation of rights, [the insureds] were placed in a precarious position. At trial, they faced the possibility of a jury verdict greater than their . . . policy limit or, even if within the limit, one that might not be covered. We therefore agree with [the underlying plaintiff, pursuing the insureds' indemnity claims subject to an assignment,] that the insureds had the need to act reasonably to protect themselves from the sharp thrust of personal liability. . . . [The insurer's] position was that the cooperation clause gave it a right to force the

insureds to reject any settlement, no matter how reasonable, risk trial, and place themselves at danger of a judgment larger than the policy limits or one that might not be covered.

In effect, such an interpretation of the cooperation clause hamstrings insureds while granting the insurer a double[-]bite at escaping liability.... If the verdict were in favor of [the claimant], ... [the insurer] would have another chance at escaping the obligation to indemnify because it would be able to relitigate the ... coverage issue in a declaratory judgment action.... [A]bsent bad faith conduct, [the insurer] will never be at risk for more than [the policy limit]. Thus, the insureds risk financial catastrophe if they are held liable, while the insurer may save itself by litigating both issues—the insured's liability and the coverage defense—and winning either.

741 P.2d at 250–51 (footnote, internal quotation marks, and citations omitted).

The Arizona Supreme Court acknowledged what we agree, based upon our own research, is the majority rule: that the solution to this conflict is to permit an insured to reject a defense offered under a reservation of rights, thereby forcing the insurer either to defend unconditionally (*i.e.*, without reservation regarding coverage), or "to refuse to defend at its peril." *Id.* at 251 (citing *Cont'l Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281 (Alaska 1980); *Norton v. Farmers Auto. Inter–Ins. Exch.*, 40 Cal.App.2d 556, 105 P.2d 136 (1940); *Boise Motor Car Co. v. St. Paul–Mercury Indem. Co.*, 62 Idaho 438, 112 P.2d 1011 (1941); *Three Sons, Inc. v. Phoenix Ins. Co.*, 357 Mass. 271, 257 N.E.2d 774 (1970); *Butters v. City of Independence*, 513 S.W.2d 418, 425 (Mo.1974); 7C J. Appleman, Insurance Law and Practice § 4686, at 175 (1979)). However, the

*Morris* court found that this approach "puts an insurer honestly attempting to perform its duties between Scylla and Charybdis":

> The insurer must either give up its right to raise tenable coverage defenses or its right to insist on full application of the cooperation clause.... Insureds' settlements often are motivated solely by their strongly-felt need for economic survival and the claimant's desire for a quick judgment that will enable him to get after what he perceives as the real business—collecting from the insurer. From a public policy standpoint, the result of such agreements is both unpredictable and often unfair to one side or the other.

> The better result would permit the insurer to raise the coverage defense, and also permit an insured to protect himself from the risk of non[-]coverage or excess judgment, while at the same time protecting the insurer from unreasonable agreements between the claimant and the insured.

> \*   \*   \*

> Accordingly, we hold that the cooperation clause prohibition against settling without the insurer's consent forbids an insured from settling only claims for which the insurer unconditionally assumes liability under the policy.... The insurer's reservation of the privilege to deny the duty to pay relinquishes to the insured control of the litigation, almost as if the insured had objected to being defended under a reservation.

*Id.* at 251–52 (citations, internal quotation marks, and original modifications omitted). Several other courts have adopted the same rule. *See Travelers Indem. Co. v. Dingwell*, 884 F.2d 629 (1st Cir.1989) (Maine law); *Ins. Co. of N. Am. v. Spangler*, 881 F.Supp. 539 (D.Wyo.1995); *Harris*, 905 A.2d 819; *cf. Continental Ins. Co.*

*v. Bayless & Roberts, Inc.*, 608 P.2d 281 (Alaska 1980) (holding that an insurer must either tender an unqualified defense or withdraw from representation); *Kelly*, 620 N.W.2d 637 (holding that when an insurer rejects a reasonable settlement **because** it contests coverage, it is in breach of contract and cannot enforce the consent to settlement clause, and distinguishing this case from one in which an insurer "mere[ly] commence[s] a declaratory judgment action," which does not, itself, constitute a breach).

The trial court in this case found additional support for the *Morris* approach in secondary authorities. T.C.O., 7/6/2011, at 9 (quoting Couch on Insurance § 199.48 (3d ed. 2005); 16 Williston on Contracts § 49.108). What the trial court did not do was address the holdings of the numerous jurisdictions that (implicitly or explicitly) have rejected the *Morris* framework.

That omission is problematic, because *Morris* and its progeny suffer from at least one critical incongruity. To wit, the *Morris* court recognized that a contract that is clear on its face must be interpreted consistently with its terms, when it held that "[w]hen an insurer performs its contractual obligation to defend, **the policy requires the insured to cooperate with the insurer.**" *Id.* at 250 (emphasis added). Thus, the insured may not settle with the claimant "unless the insurer first breaches one of its contractual duties." *Id.* The *Morris* court continued, the insurer, in defending subject to a reservation, "**did not breach any of its policy obligations.**" *Id.* at 251 (emphasis added). But, notwithstanding the insurer's acknowledged satisfaction of its obligations under the parties' insurance contract, the insurer's failure to "accept full responsibility for [the insureds'] liability exposure" in effect triggered an entitlement on the part of the insureds to breach the express terms of

the agreement with impunity. *Id.* at 251. In so many words, while the *Morris* court held that the insurer's defense with a reservation did not constitute a breach of contract, the court nonetheless relieved the insured of its own corresponding contractual duty.

Among the cases that reject the *Morris* approach is *Vincent Soybean*, *supra*. In that case, the insured sought coverage when a client alleged that the insured had negligently stored and processed its wheat seeds. Following an initial investigation, counsel selected by the insurer to represent the insured informed the insured that it would furnish a defense, but reserved the insurer's right to challenge coverage. Counsel also cautioned the insured not to enter into a settlement with the claimant without the insurer's permission. Nonetheless, the insured, acting without counsel, did precisely that, and the insurer refused the insured's request for reimbursement. 246 F.3d at 1130–31.

Reviewing the policy's consent to settlement clause, the court observed that such clauses are intended "to prevent collusion and to invest the insurer with the complete control and direction of the defense or compromise of suits or claims." *Id.* at 1131 (quoting 14 Russ & Segalla, Couch on Insurance § 203.3, at 203–08 (3d ed. 1999)). The insured's breach of this clause absolved the insurer of liability unless the insurer, "in bad faith, breached the contract by arbitrarily refusing to settle." *Id.* (quoting *Home Indem. Co. v. Snowden*, 223 Ark. 64, 264 S.W.2d 642, 645 (1954)). Bad faith, the court further explained, occurs when the insurer "breaches its contract by refusing to defend or settle and denying liability, or by withdrawing from the case." *Id.* (quoting *Snowden*, 264 S.W.2d at 646). The insured failed to establish bad faith, so defined. Notwithstanding the insurer's indication that it

might in the future contest coverage, it fully undertook the defense. *Id.* The court determined that merely accepting the claim and undertaking to defend it subject to a reservation of rights did not constitute bad faith. *Id.* at 1132. Rather, bad faith would inhere only if the insurer denied liability **and** refused to defend. *Id.* Implicitly, then, the *Vincent Soybean* court rejected the very analogy between the complete denial of a defense and the tender of a defense subject to a reservation that the trial court relied upon in the instant case in determining that *Alfiero* furnished the appropriate standard.

Other cases also have held that, when an insurer tenders a defense subject to a reservation regarding coverage, it retains its full authority under a consent to settlement provision. Rather than give the insured *carte blanche* to settle the case without the insurer's approval, these courts have entrusted the insured's interests to the insurer's general obligation of good faith and fair dealing. *See Motiva Enterps., LLC, v. St. Paul Fire & Marine Ins. Co.,* 445 F.3d 381 (5th Cir.2006) (Texas law); *Danrik Constr. Inc. v. Amer. Cas. Co. of Reading, Penna.,* 314 Fed.Appx. 720 (5th Cir.2009) (Louisiana law) (unpublished); *L & S Roofing Supply,* 521 So.2d at 1303–04; *First Bank of Turley v. Fid. & Dep. Ins. Co. of Md.,* 928 P.2d 298 (Okla. 1996); *Maine Bonding & Cas. Co. v. Centennial Ins. Co.,* 298 Or. 514, 693 P.2d 1296 (1985). Some jurisdictions have imposed a heightened good faith requirement upon the insurer to protect against the potential conflict of interest inherent when an insurer defends a case, recognizing that trial strategy may affect the outcome of an anticipated challenge to coverage. *See L & S Roofing Supply,* 521 So.2d 1298, *supra.*

We find that the *Vincent Soybean* approach is perhaps too cavalier regarding the risk imposed upon the insured when an insurer rejects an opportunity to accept a reasonable settlement offer and opts to proceed to trial. This risk originates, as noted above, in the inherent conflict between the insured's interest in settling a claim against him expeditiously and within the policy limits and the insurer's interest in establishing a basis to deny coverage. While the prospect of relief for an insurer's bad faith inheres under Pennsylvania law when an excess verdict is returned after an insurer rejects a settlement within the policy's limit, *see Cowden, supra,* it requires little imagination to conceive of a scenario under which an insurer's refusal to accept a reasonable settlement inures to the detriment of the insured, even if the verdict ultimately returned falls within the policy limit. For example, should the insurer successfully challenge coverage and the verdict exceed the rejected settlement offer, the insured will be liable to a greater extent than it would have been under the settlement. As well, delay in resolving litigation, by itself, may inflict harm upon the insured arising from uncertainty as to the fact, extent, and timing of liability, exacerbated by questions regarding coverage. *See Nandorf, Inc., v. CNA Ins. Cos.,* 134 Ill.App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988, 994 (1985) (declining to find insured's declaratory action regarding coverage for punitive damages premature, because waiting until after the imposition of judgment would be substantially prejudicial).

In short, we believe that the *Morris* and *Vincent Soybean* approaches tilt the playing field too much in favor of, respectively, the insured or the insurer. There is, however, a third approach, an approach that we believe best balances the interests of the insurer and the insured. Indeed, this is precisely the approach recognized by *Morris* as the majority rule. *See Morris,* 741 P.2d at 251 (citing cases from Alaska,

California, Massachusetts, Missouri, as well as 7C J. Appleman, Insurance Law and Practice § 4686, at 175 (1979)).

This third approach is one that neither the parties nor the trial court have identified or discussed as such. In *Taylor v. Safeco Insurance Company*, 361 So.2d 743 (Fla.Ct.App.1978), the insurer tendered a defense subject to a reservation of rights, but then withdrew its defense. Once trial commenced, however, the insurer retendered a defense, again with a reservation of rights. The insured rejected the tender, and without counsel consented to a substantial judgment, assigning its right to seek reimbursement from its insurer to the plaintiff in exchange for a release from all personal liability for the judgment. The plaintiff, as assignee of the insured's rights, then sought reimbursement from the insurer. The trial court granted the insurer summary judgment based upon the insured's failure to honor the policy's consent to settlement clause. *Id.* at 744.

The court of appeals reversed. It observed that the case before it "vividly illustrate[d] the tensions that afflict agreements between insurer and putative insured that the insurer shall provide a defense without conceding liability for any judgment." *Id.* at 746. The court held that, "[j]ust as the insurer is not required to abandon its contest of a duty to pay as a condition of fulfilling an assumed or admitted duty to defend, the insured is not required to abandon control of his own defense as the price of preserving his claim, disputed by the insurer, that the insurer pay any judgment." *Id.* at 745. (citing *Bergh v. Canadian Univ'l Ins. Co.*, 197 So.2d 847, 849–50 (Fla.Ct.App.1967); *Butters*, 513

S.W.2d at 425).[11] *Id.* at 746. Because the insured had rejected the insurer's defense, the court found that, if coverage were established, the insurer would be obligated to indemnify the insured for the amount of settlement up to the policy limit if the settlement was "reasonable" and was not entered into "in bad faith, fraudulently, collusively, or without any effort to minimize his liability." *Id.* at 746–47.

Conversely, in divergent circumstances, in *United National Insurance Co. v. Jacobs*, 754 F.Supp. 865 (M.D.Fla.1990), the district court applied *Taylor* to different effect. In that case, the court determined that an insurer had no obligation to indemnify an insured who accepted the insurer's offer of a defense subject to a reservation but settled the claim without the insurer's consent. In that case, following notice of the pending claim, the insurer agreed to undertake the insured's defense and appointed counsel to represent the insured. Appointed counsel filed a motion for summary judgment on behalf of the insured, and opined that the motion likely would be granted. The insured consulted another attorney, who predicted that the motion would be denied, and suggested that the insured seek settlement. Before the motion for summary judgment was decided, the insured entered into a settlement for the policy limit and assigned his rights to seek reimbursement to the plaintiffs. The insurer, who continued to represent the insured at the time of settlement, did not consent to that settlement. *Id.* at 867–68.

Thereafter, the insurer sought a declaratory judgment that it was not obligated to indemnify the insured for the settlement, *inter alia*, due to insured's violation of the

11. The court identified this holding as "the exact and equally true converse" of the holding in *Three Sons*, 257 N.E.2d at 777 (holding that the insurer "had a duty to defend the plaintiff ... without a reservation of rights or a claim of non[-]waiver, so long as it insisted on retaining control of the defense").

consent to settlement clause. The insured, relying on *Taylor,* argued that he had the prerogative to settle due to the insurer's reservation of rights. The district court distinguished *Taylor* on the basis that the insured never rejected the insurer's defense: "Because [the insured] accepted the defense, he gave [the insurer] exclusive control of the litigation. By neither rejecting the defense nor acquiring [the insurer's] consent, [the insured] breached the terms of the policy when he settled the lawsuit...." *Id.* at 870. "[The insured] could not assume control over the ... litigation until he either refused [the insurer's] defense or obtained [the insurer's] approval. Because he did neither before settling the case ..., he acted at his own risk." *Id.* at 871.

Pennsylvania impliedly has recognized the correlation between the insurer's provision of a defense and the right of the insurer to control same. *See Eckman v. Erie Ins. Exch.,* 21 A.3d 1203, 1207 (Pa.Super.2011) (holding that a "duty to defend insurer" has the right to defend litigation and to select counsel); *cf. J.H. France Refractories Co. v. Allstate Ins. Co.,* 534 Pa. 29, 626 A.2d 502, 510 (1993) (holding that, as between two interested insurers seeking to establish which will defend, "[t]he defense of a claim is a right, as well as a duty, failing upon the insurer. In order to effectuate that right, we hold that the selection of [which insurer will] undertake a defense is to be made by [those] insurers"—*i.e.,* not by the insured). In *Eckman,* moreover, this Court recognized a critical aspect of the *Taylor* approach: Citing *Widener University v. Fred S. James & Co., Inc.,* 371 Pa.Super. 79, 537 A.2d 829, 833 (1988), we appeared to recognize an insured's prerogative entirely to reject an insurer's defense tender, while implying that, when an insured accepts a defense tender, the insured must relinquish control of the defense to the insurer.

As well, numerous other jurisdictions have adopted variations on the *Taylor* compromise; in particular, Missouri repeatedly has applied and carefully delineated the application of this rule. *See Central Bank v. St. Paul Fire & Marine Ins.,* 929 F.2d 431, 433 (8th Cir.1991) (Missouri); *Butters,* 513 S.W.2d at 424–25 (Mo. 1974); *Safeco Ins. Co. of Amer. v. Rogers,* 968 S.W.2d 256, 258 (Mo.1998); *Truck Ins. Exch. v. Prairie Framing, LLC,* 162 S.W.3d 64, 88 (Mo.Ct.App.2005); *accord Mid–Continent Cas. Co. v. Amer. Pride Bldg. Co., LLC,* 601 F.3d 1143 (11th Cir. 2010) (Florida); *Med. Protective Co. of Fort Wayne, IN, v. Davis,* 581 S.W.2d 25 (Ky.App.1979). Still other courts have adopted variations on the *Taylor* approach in somewhat different contexts. *See Farmers Group, Inc., v. Trimble,* 691 P.2d 1138, 1141 (Co.1984) (*en banc* ) ("[W]here a person purchases an insurance policy, he barters to the insurance company all of the rights possessed by him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury. He has contracted with the insurer that it shall have the exclusive right to settle or compromise the claim, to conduct the defense, and that he will not interfere except at his own cost and expense."); *Sneed v. Concord Ins. Co.,* 98 N.J.Super. 306, 237 A.2d 289, 293 (1967) (finding insurer's contest regarding coverage estopped because insurer failed clearly to state its reservation of rights, leaving insured without the option of declining the insured's qualified defense; absent a valid notice of the reservation of rights, "the insured ... gives up valuable rights in respect of control of investigation and negotiations for settlement"); *Connolly v. Std. Cas. Co.,* 76 S.D. 95, 73 N.W.2d 119, 122 (1955) (holding that insureds, in never seeking to assume the defense, "impliedly

assented to conduct of the defense by the insurer under the reservation of rights").

We find that the *Taylor* approach, in providing an insured the option to decline a defense tendered subject to a reservation of rights, but protecting an insurer's right to control the defense when it is accepted by the insured, best balances the interests of insurer and insured, and better honors the binding nature of the insurance contract. By granting the insured a basis upon which to eliminate the risk of a conflict of interest at the outset of a claim, it does not consign the insured solely to the protection of our strictly-construed bad-faith standard. At the same time, our approach protects an insurer's right to control litigation when it provides a defense. *See Eckman, supra; Weissman,* 434 N.Y.S.2d at 412 (requiring that the insurer provide a defense, but indicating that the insurer "is still entitled to control the defense of the action ... provided that the defense is pursued in good faith and without any endeavor to demonstrate the policy ... does not afford coverage"). We deem it essential that the party defending a suit, whether insurer or insured, retain the unqualified prerogative to proceed in the way that it determines is best. This approach also honors the essence of a consent to settlement clause: When an insured avails itself of the insurer's obligation to defend, the insured remains bound to the corollary requirement that the insurer have sole authority to control the defense.

■ This is not to say that, when an insured accepts the insurer's defense, the insurer's conduct of the litigation is subject to no further scrutiny. It remains bound by its fiduciary obligation to represent the insured's interests, and to settle the case when appropriate, in keeping with its obligation of good faith. *See Gedeon v. State Farm Mut. Auto. Ins. Co.,* 410 Pa. 55, 188

A.2d 320, 322 (1963) ("[B]y asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured.... If the insurer is derelict in this duty, as where it ... unreasonably refuses an offer of settlement, it may be liable ... for the entire amount of the judgment secured against the insured.... [T]here can be a breach of this fiduciary duty without a breach of either the covenant to indemnify or the covenant to defend.").

■ Guided by fundamental precepts of contract law, we cannot agree with the trial court's determination that *Morris,* by way of *Alfiero,* supplies the best paradigm for deciding this case. An insurance contract that is clear on its face will be enforced according to its terms. *See Donegal Mut. Ins. Co.,* 938 A.2d at 290. Only in the event of a material breach of the contract by one party will the counterparty be relieved of its burden to perform under the contract. *See Gillard v. Martin,* 13 A.3d 482, 487 (Pa.Super.2010) (holding that after an alleged material breach of contract by one party, the other party may allege total breach and cease performance, but, "by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform"). However, an insurer does not breach an insurance contract at all, let alone materially, merely because it tenders a defense subject to a reservation of rights later to contest coverage. *See Jerry's Sport Center,* 2 A.3d at 543–46. While *Morris* paid lip service to these principles, it flouted them when it relieved the insured of its contractual obligations despite the absence of a material breach. We can discern no way to adopt the *Morris* approach without doing violence to Pennsylvania's law of contracts. The instant case does not present any

injustice so great as to warrant such a ruling.

We reject the *Morris* approach not only because it contravenes fundamental precepts of contract law, but also because we believe that it is founded on an unrealistic diminution of the risks facing an insurer defending subject to a reservation. When an insurer can be certain that no coverage will attach in a given instance, it may decline to defend outright. When an insurer defends subject to a reservation, however—especially when, as in this case, the defense costs tens of millions of dollars—it is fair to infer a considerable degree of uncertainty on the part of the insurer regarding its coverage defense. Under the circumstances presented, at least, it is fair to say that each side had a considerable incentive to settle at a level deemed reasonable. Put another way, under these circumstances the insured could not cavalierly reject an opportunity to settle a claim at a reasonable value.

Like the Arizona Supreme Court in *Morris,* the trial court in this case dwelled exclusively on B & W's exposure and consequent incentive to minimize settlement without recognizing that ANI faced considerable risk in declining to approve settlement while the question of coverage remained open. As noted by B & W, the trial court's suggestion to the contrary notwithstanding, the result of the eight test trials conducted at an earlier stage of the litigation implied that a trial verdict for approximately 300 plaintiffs resulting in similar individual verdicts might easily have exceeded the balance of the policy.[12] This would have exposed the insurer not only to the limit of the policy, but also to liability for a massive excess verdict, were it found to have declined in bad faith to settle under *Cowden* and its progeny.

We also note that application of the *Morris* standard would appear to reduce an insurer's incentive to undertake the defense at all, if it anticipates that a viable coverage defense will be available after trial on the underlying suit. If the insurer is to lose control of the terms of settlement simply for reserving its rights until continuing discovery and fact-finding illuminate whether a viable coverage defense exists, subject only to a jury's determination as to what sort of settlement is "fair and reasonable," the insurer reasonably might choose to decline to defend entirely. If it does so, and coverage is found, it is exposed at most for the reimbursement of the insured's costs of defense [13] and either the verdict or that portion of the amount of settlement that is deemed fair and reasonable. While the insurer may expose itself to an excess verdict by declining to defend, the same is true in the event that it defends subject to a reservation and

---

12. The trial court relied in part on its intuition that the *Hall* plaintiffs' attorney would not have settled the case at $80 million had counsel believed that the potential verdict would exceed policy limits. T.C.O., 7/6/2011, at 2. While this might militate against a finding of bad faith, we fail to see why that fact would bear on whether to **apply** a bad-faith standard instead of one inquiring only as to fairness and reasonableness.

Moreover, we credit at least the outlines of B & W's concern that the eight test trial verdicts entered in 1998, which resulted in awards averaging approximately $4.5 million per plaintiff, extrapolated across 250 to 300 claimants certainly suggested the prospect of an aggregate verdict well in excess of the policy limits, and perhaps as high as $1 billion, exclusive of pre- or post-judgment interest and what would have been voluminous defense costs associated with the defense of litigation involving hundreds of plaintiffs. *See* Brief for B & W at 24–26.

13. *See Gedeon,* 188 A.2d 320; *Am. States Ins. Co. v. State Auto Ins. Co.,* 721 A.2d 56, 64 (Pa.Super.1998); *Nandorf,* 88 Ill.Dec. 968, 479 N.E.2d at 991–92; *First Bank of Turley,* 928 P.2d at 305–06.

exercises its right to control settlement in a manner indicating bad faith.

■ For the reasons set forth above, we hold that, when an insurer tenders a defense subject to a reservation, the insured may choose either of two options. It may accept the defense, in which event it remains unqualifiedly bound to the terms of the consent to settlement provision of the underlying policy. Should the insured choose this option, the insurer retains full control of the litigation, consistently with the policy's terms. In that event, the insured's sole protection against any injuries arising from the insurer's conduct of the defense lies in the bad faith standard articulated in *Cowden.*

Alternatively, the insured may decline the insurer's tender of a qualified defense and furnish its own defense, either *pro se* or through independent counsel retained at the insured's expense. In this event, the insured retains full control of its defense, including the option of settling the underlying claim under terms it believes best. Should the insured select this path, and should coverage be found, the insured may recover from the insurer the insured's defense costs and the costs of settlement, to the extent that these costs are deemed fair, reasonable, and non-collusive.

It now remains for us to apply the *Taylor* framework to the case before us. At the outset, we note that we are constrained to consider only the lone question not expressly waived or otherwise resolved between the parties [14]: Whether the trial court erred in ordering a trial to determine ANI's responsibility for reimbursing B & W $80 million plus pre-judgment interest, notwithstanding B & W's violation of the consent to settlement clause in the policy, premised solely upon the question of whether the settlement entered over ANI's objections was "fair and reasonable."

We are constrained to reverse the trial court's ruling in this regard. Because we believe *Taylor* provides the standard most consistent with Pennsylvania law, we hold that the trial court erred in so constraining trial. Instead, the trial should have been directed at determining 1) whether B & W in fact rejected ANI's defense; and, if not, 2) whether ANI acted in bad faith in declining to settle, or, as alleged by B & W, to participate in settlement negotiations with the *Hall* plaintiffs. On the former question, it appears to us undisputed that B & W did not reject the defense tendered by ANI. However, in a case this complex, we hesitate to make such an inference on the record before us, especially inasmuch as this case must be remanded for further proceedings in any event. On the latter question, we note our observation above that we do not intend to preclude the prospect that ANI's refusal to settle may have constituted bad faith even absent the excess verdict that lies at the heart of most bad-faith case law. Given the exposure to B & W in the ongoing litigation, as amplified by ANI's insistence that it had one or more viable coverage defenses, we leave open the possibility that ANI's refusal to participate in settlement negotiations or accept the $80 million settlement constituted bad faith. *See Maine Bonding,* 693 P.2d at 1299 (holding that an insurer's duty to defend in good faith not only may require an insurer to enter into negotiations invited by the plaintiff, but also may require that an insured initiate such negotiations). This determination best resides with the trial court in the first instance.

Accordingly, we must vacate the jury verdict and the judgment entered pursuant

14. The parties' severance and dismissal of all claims and issues beside the issue presented in this case is reflected in the trial court's final order of February 17, 2012.

thereto. We direct the trial court to conduct a new trial in conformity with the standard articulated above.

Motion to Strike or Suppress Portions of Appellant's Reply Brief denied. Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.

OLSON, J. files a Concurring and Dissenting Opinion.

### CONCURRING AND DISSENTING OPINION BY OLSON, J.:

I respectfully concur and dissent. I agree with the learned Majority's view that the jury's verdict and the trial court's judgment should be vacated because the court erred in applying *Alfiero v. Berks Mutual Leasing Co.*, 347 Pa.Super. 86, 500 A.2d 169 (1985) and *United Servs. Auto Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987) to conclude that Appellants, American Nuclear Insurers and Mutual Atomic Energy Liability Underwriters (collectively, ANI), owed settlement costs to Appellees, The Babcock & Wilcox Company and B & W Nuclear Environmental Services (collectively, B & W), because the settlement agreements between B & W and plaintiffs in the federal personal injury litigation were found to be fair, reasonable, and non-collusive. I am unable to agree, however, with the Majority's conclusion that this case should be remanded for further proceedings consistent with the approach set forth in *Taylor v. Safeco Insurance Co.*, 361 So.2d 743 (Fla.Ct.App.1978). In my view, established and controlling Pennsylvania law compels the conclusion that since ANI tendered a defense subject to a reservation of its rights to contest coverage, B & W remained committed to observe its obligations under the consent-to-settlement clause in the parties' insurance contract unless B & W could establish bad faith on the part of ANI pursuant to our Supreme Court's decision in *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957).

As the Majority recognizes throughout its opinion, this case illustrates the tensions that can arise between an insurer and insured when the insurer tenders a defense subject to a reservation of its right to challenge coverage for the underlying claim. The Majority also acknowledges that our Supreme Court's decision in *Cowden* supplies the applicable rule of decision when a court is asked to enforce a consent-to-settlement clause where an insurer provides a defense and advises its insured that it intends to contest indemnity. *Cowden* provides that a Pennsylvania court should enforce a consent-to-settlement clause unless an insured such as B & W can establish: 1) there was no real chance of a defense verdict; 2) there was little possibility of a verdict or settlement within policy limits; 3) the insurer's decision to reject settlement and go to trial was not based on a *bona fide* belief that there was a good chance of winning; and, 4) the insurer's decision to litigate rather than settle was made dishonestly. *Cowden*, 134 A.2d at 228. Although some time has elapsed since *Cowden* was issued in 1957, our Supreme Court has not signaled any retreat from the decision and, in 2001, the Court reaffirmed its commitment to *Cowden*'s holding. *See Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 787 A.2d 376, 379 (2001) (citing *Cowden* for the rule that an insurer breaches its duty of good faith when it refuses to settle a claim that could have been resolved within policy limits without a *bona fide* belief that there was a good possibility of winning).

Notwithstanding its acknowledgement of the foregoing principles as set forth in binding precedents handed down by our Supreme Court, the learned Majority remands this matter for further proceedings consistent with the Florida court's decision

in *Taylor*. In so doing, the Majority alters the parties' insurance contract, bestowing upon the insured a new option, never before recognized under Pennsylvania law, to reject a defense offered pursuant to a valid reservation of rights clause in an insurance agreement.[1] Although the Majority discusses at length why *Cowden* **should not** be applied, it makes no effort to distinguish *Cowden* on legal or factual grounds or to explain why the framework set forth in that case **cannot** be applied here. Instead, the Majority reasons that *Taylor* represents a preferable approach because, in the Majority's view, the decision "best balances the interests of insurer and insured" and "does not consign the insured solely to the protection of our strictly-construed bad faith standard" set forth in *Cowden*. *See* Majority Opinion at 20.

To be sure, the Majority's comprehensive review of relevant insurance case law illustrates that the approach articulated in *Taylor* has garnered widespread application. Nonetheless, as an intermediate appellate court, I do not believe that it is within our prerogative to sidestep binding Supreme Court authority in favor of rules that we may deem preferable or even broadly accepted. We recently observed:

> As an intermediate appellate court, th[e Superior Court] is obligated to follow the precedent set down by our Supreme Court. It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court.

*Sackett v. Nationwide Mut. Ins. Co.*, 4 A.3d 637, 641 (Pa.Super.2010), *quoting Moses v. T.N.T. Red Star Express*, 725 A.2d 792, 801 (Pa.Super.1999).

In sum, while I agree that the jury's verdict and the trial court's judgment must be vacated, I cannot agree that this case should be remanded for further proceedings consistent with *Taylor*. Because I believe that our Supreme Court's opinion in *Cowden* supplies the applicable rule of decision for the issues raised in this appeal, I would instruct the trial court to follow *Cowden* (consistent with its original inclination) in addressing the matters presently before us.

---

1. Not surprisingly, the parties, both before the trial court and on appeal, tailored their arguments to existing Pennsylvania law. B & W's contentions tracked the decision in *Alfiero* while ANI's position tracked *Cowden*. In view of this, I believe that the Majority's alteration of well-established Pennsylvania insur-

ance law will disturb the settled expectations of both insureds and insurers alike. By itself, this aspect of today's decision undermines the Majority's assertion that the *Taylor* approach will "better honor the binding nature of the insurance contract." Majority Opinion at 20.